MERCEDES BERDECÍA, Plaintiff and Respondent, *v.* ELIZABETH TYRELL HOWARD ET AL., Defendants and Appellants.

No. 134. Submitted May 5, 1961.—Decided May 23, 1961.

*Benjamín Ortiz, Carlos E. Colón, Luis A. Negrón López,* and *Lorenzo Lagarde Garcés* for appellants. *Héctor Lugo Bougal* for respondent.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

Mercedes Berdecía filed an action of filiation[1] on August 18, 1952, against the heirs of Félix Saurí Tyrell,[2] on the grounds of concubinage and possession of status. She alleged that she was born on October 3, 1928[3] as a result of a love affair and concubinage between said Félix Saurí and her natural mother, Dolores Berdecía, who at the time of her conception and birth could contract marriage, without any impediment, and that the plaintiff has been in the uninterrupted possession of status of natural daughter of her aforesaid father, which fact is warranted by "his unequivocal and spontaneous acts, who summoned a midwife to assist Dolores Berdecía during childbirth, who admitted before said midwife and other persons that the child to be born was his child and provided after birth for its support, giving the child medicine, medical attention and food, treating plaintiff continuously, frankly and openly as his natural daughter, and that on or about April 27, 1928, wishing to provide a home for his child to be born, he bought her a house in the name of Dolores Berdecía."

On a previous occasion the plaintiff had filed an action for her acknowledgment. The filiation action filed on September 5, 1935, was personally notified to the putative natural father, who did not appear to plead, and thus his default was entered.[4] However, this first attempt by the plaintiff to

---

[1] Other causes of action were added—nullity of the institution of heirs and nonexistence of contracts—the final determination of which depends on the outcome of the action of filiation. It is not necessary that we consider this aspect of the controversy.

[2] Félix Saurí Tyrell died intestate and unmarried on December 3, 1938.

[3] Although in the original complaint it was alleged that the plaintiff was born on September 3, 1928, in the answer to an interrogatory which defendant submitted to her it was made clear that the correct date is the one stated in the text of this opinion.

[4] In regards to the acknowledgment, the action was also based on the causes of concubinage and the possession of status. The allegations to that effect are *identical* to the ones in the present case, except for some difference in the language, style and order, which are unimportant.

obtain her acknowledgment through judicial channels ended with a judgment of dismissal for abandonment.[5]

On March 10, 1959, the trial court rendered judgment granting the complaint on the following findings of fact and conclusions of law which we copy below:

"1. Dolores Berdecía or Verdés was born in Coamo on March 13, 1911. Félix Rafael Saurí Tyrell was born in Ponce, on April 6, 1907, the only boy in a wealthy family who lived across the Plaza de las Delicias, in Ponce. Dolores started to work there in 1925, as a maid. Both were single and were not related to each other. At the end of the year 1926, Félix Rafael courted her and had sexual relations with her, without his parents knowing it. Dolores became pregnant in January 1928 and on October 3 of the same year, the plaintiff was born.

"2. Said relations continued in the house of Félix Rafael's parents until the fourth month of her pregnancy. He then bought her a house in Miramar Street for $62. He also paid the cost of an enlargement made to it. Dolores went to live in said house with her parents and one of her sisters. Félix Rafael visited her there and had sexual relations with her.

"3. Félix Rafael graduated from high school in the same city of Ponce in June 1928, and intended to continue his studies in the United States. In August he went with Dolores and her sister's concubine to talk with the mother of the latter who was a midwife. Félix Rafael asked the midwife to assist Dolores during childbirth and agreed to pay her $25.

"4. Félix Rafael left for the United States on September 6, 1928. The plaintiff was born the following month. He returned from the United States in June 1929. He went to see her the same day he arrived at Ponce and continued visiting Dolores until September, when he left again for the United

[5] On the ground that pursuant to Rule 41(b) of the Rules of Civil Procedure of 1943 (32 L.P.R.A. App. R. 41(b)) this judgment was an adjudication on the merits, the trial court dismissed the complaint in the present case and granted the special defense of res judicata presented by the defendants. By a per curiam opinion of April 22, 1956, rendered in appeal No. 11923, we decided that the judgment did not constitute res judicata, because the former suit for filiation was not *pending* when the Rules of 1943 went into effect and on the same ground, we rendered judgment on October 23, 1958 reversing the Superior Court, Ponce Part, and remanding the case for the determination of other questions raised.

States. He returned once more in the summer of 1930 and continued his relations with Dolores until he left again in August of the same year. In 1931 he did not come to Puerto Rico. He returned in the summer of 1932, but he did not return to Dolores nor did he have any more relations with his daughter.

"5. From the United States, Félix Rafael sent Dolores $20 a month for her and the child. He sent said amount until 1931 or 1932.

"6. Félix Rafael lived in Puerto Rico at the home of his parents. He always kept from them, as well as from his friends, the relations he had with Dolores. He visited her during the night but went to sleep to his own house. The family and social environment in which he lived was not, as we can see from the evidence, one in which he could make ostentations of such relations or of the child had from the same.

"7. Félix Rafael finished his studies in the United States in 1934 when he definitively returned to Puerto Rico. In 1935 Dolores sued him asking for the plaintiff's filiation, who then was not of age. This suit was dismissed for abandonment after Félix Rafael had been summoned and his default entered; but the filing of this complaint contributed even more, because of the family and social environment in which he lived, to refrain him from making any demonstration that would give away his paternity. He did not live much longer. He died in Ponce on December 3, 1938, single, intestate and with no other descendants than the plaintiff."

The only footnote added to the trial's court opinion seems to be particularly significant. It reads as follows:

"We have examined the plaintiff's evidence with extreme care because the case was filed after the putative father had died. For this reason we have only given credit to that evidence presented by the plaintiff which we have believed because it appears to be supported by other facts which have not actually been in controversy. The aforesaid finding No. 5, which is probably controlling in this case, was not based exclusively on the oral evidence which tends to establish it directly, but on the following testimony by Dolores on cross-examination which coincides with defendant's evidence as to Félix Rafael's trips (see finding No. 4): 'Could you tell me if when he returned

in the summer of thirty-three, you had broken off with him, or he had broken off with you, and had stopped sexual relations?' —'He still went to my house.'—'Are you absolutely sure of what you are saying?'—'Yes sir. He was not coming to my house. He stopped coming to my house when the baby was three years old . . . He sent the baby money until she was four years old. He sent money to the baby for a year, without going to the house.' (Pp. 31 and 32 of the transcript of the record of the hearing of February 25, 1954.)"

To review the judgment we issued the writ of review at defendant's request. Six errors are alleged to have been committed, which, in general terms, are directed to attack— on different grounds—the sufficiency of the evidence to establish the filiation granted, on the basis of uninterrupted possession by the plaintiff of status of natural child of Félix Saurí.[6]

The law in force at the time of the birth of the plaintiff, which is binding on us in order to determine her right to the acknowledgment,[7] is § 193 of the Civil Code,[8] as

---

[6] It is alleged that the court erred: (1) in deciding that it was established that the plaintiff is the natural daughter of Félix Rafael Saurí; (2) in deciding that the plaintiff enjoyed the uninterrupted possession of status of natural daughter; (3) in deciding that it had to join the proof of the paternity to the proved facts, pursuant to finding No. 5, in order to establish the plaintiff's filiation; (4) in establishing finding of fact No. 5, as the same is not supported by the evidence, in view of the fact that the trial court committed error in weighing the evidence in that respect; (5) in deciding that the paternity proof was important to establish filiation; (6) in rendering the judgment of filiation without making any conclusions of law in regards to the uninterrupted possession of status.

[7] Silva v. John Doe, 75 P.R.R. 198, 207 (1953); Torres v. Heirs of Cautiño, 70 P.R.R. 614 (1949); Toro v. Ríos, 68 P.R.R. 704 (1948); Mercado v. Heirs of Mangual, 35 P.R.R. 388 (1926); Núñez v. Lacot, 32 P.R.R. 76, 79 (1923); Ex parte Morales, 30 P.R.R. 848, 851 (1922); Morales v. Heirs of Cerame, 30 P.R.R. 784 (1922); Méndez v. Martínez, 21 P.R.R. 238 (1914). pp. 103 and 287, Vol. XX (1960).

[8] With the exception of the brief lapse of time between the effective date of the Civil Code of 1902 and the approval of Act No. 73 of March 9, 1911 (Sess. Laws, p. 234), the legal provisions on the compulsory recognition when the child is in the uninterrupted possession of status of a natural child have remained unaltered since January 1, 1890, effective date in Puerto Rico of the Spanish Civil Code by virtue of Royal Decree

amended by Act No. 73 of March 9, 1911 (Revised Statutes, 1911, § 3263), which reads as follows:

"..  .    .    .    .    .    .    .    .    .    .

"The father is obliged to recognize the natural child:

"1.  . . . .

"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father, justified by acts of the same father or of his family.

"3. When the mother was known to have lived in concubinage with the father both during her pregnancy and at the time of the birth of the child.

"4.  . . . ."

The rule in Puerto Rico about the necessary proof to secure recognition on the basis of uninterrupted possession of status can be better understood by taking as a guidepost the memorable legacy left by Mr. Justice Córdova Dávila to our family institution in the opinion rendered by him in *Colón v. Heirs of Tristani*, 44 P.R.R. 163 (1932) and 45 P.R.R. 219 (1933), appeal dismissed for want of jurisdiction in 71 F.2d 374 (1934), and which gives a definite start to a de-

---

of July 31, 1889. See, § 135 of the Spanish Civil Code, § 189 of the Civil Code, 1902 ed. and § 125 of the Civil Code, 1930 ed. We do not find it necessary to decide herein the effect that Act No. 229 of May 12, 1942 (Sess. Laws, p. 1296) and Act No. 17 of August 20, 1952 (Sp. Sess. Laws, p. 200) may have on § 125 of the Civil Code in force. For a complete discussion of the aforesaid legislation, see Alvaro R. Calderón, Jr., *La Filiación en Puerto Rico*, Revista del Colegio de Abogados de Puerto Rico, pp. 203 and 287,, Vol. XX (1960).

It is convenient also to indicate that upon readopting in 1911 the provisions on the recognition of natural children which appear in § 195, it was significantly omitted, in regards to the possession of status, that the acts by the father establishing his paternity had to be *"direct."* Law 11 of Toro allowed for the implied or express recognition, and the child could investigate his origin by all means of proof for inquiry into the paternity; the Spanish Civil Code imposed limitations which preclude the investigation of the acts which have been performed by the parents and limits itself to the *direct* and *express* acts between parent and child. Section 189 of the Civil Code of 1902, provided that the father was bound to acknowledge the child "when publicly or privately he has shown that it is his child or has called it as such in conversation or looks after its education and maintenance."

claratory and not to a restrictive interpretation, of the provisions of subdivision 2 of § 125 of the Civil Code, upon establishing that although isolated evidence of the paternity is insufficient in itself to support an action of filiation based on the enjoyment of the status, this fact, coupled with other acts relating to said possession, may be considered sufficient to establish the filiation of the child.[9] It was decided specificacally that the means of proof in Puerto Rico, since inquiry into the paternity is allowed, are much wider than those existing under the Spanish Civil Code (at 171) and that the paternity is an element which may not be ignored. This interpretation of the concept of the possession of status has been strengthened by our recent declaration that it is not necessary to establish the filiation with strong and convincing proof, if by this we understand that a superior grade than the preponderance of the evidence is required. *Figueroa* v. *Díaz*, 75 P.R.R. 152, 163 (1953) ; *Ortiz* v. *Martorell*, 80 P.R.R. 525 (1958).

We have examined with great care the oral and documentary evidence that the trial court had before it, and upon examining it in the light of the *present* doctrine of this Court, we are absolutely convinced that the plaintiff fully proved her right of acknowledgment because she had been in the uninterrupted possession of status of the natural daughter of Félix Rafael Saurí, based on the facts that the Superior Court accepted as proved and which completely satisfy the ruling laid down in *Colón* v. *Heirs of Tristani*, *supra*. The sexual relations between the plaintiff's father and mother, his attentions to the latter's needs before and after childbirth, in consideration of the fact that she was bearing the fruit

---

[9] It was held that the following acts are sufficient to establish the possession of status: (1) when at the time of conception the mother was the mistress of the putative father; (2) that he visited her frequently, gave her money and paid her rent; (3) that he paid for the services of the midwife who attended the mother at childbirth; and (4) that the father performed certain isolated acts of affection towards the child.

of those relations—purchase of house, payment of the expenses of the enlargement of said house and his interest in obtaining the services of a midwife—his economic aid for the support of the child during the first years of her life, his visits to the child as soon as he returned from his school trips, show that the plaintiff enjoyed the possession of status of natural child of her father. It is well to remember that due to the social and economic differences prevailing, it cannot be expected that the acts of recognition be so ostensible or manifest as if it were a legitimate child, *Vega* v. *Heirs of Vega,* 32 P.R.R. 548 (1923), that it is not indispensable that the acts of acknowledgment be carried from the time of the birth of the child until the death of the father, but that it is sufficient that they be for a reasonable time, *Salas* v. *Doe; Silva,* *Int.*, 75 P.R.R. 537 (1953); *Cruz* v. *Santiago*, 24 P.R.R. 100 (1916); *cf. Toro* v. *Ríos*, 68 P.R.R. 704 (1948), and that once the possession of status is established by the acts of the father, neither the subsequent acts of the natural father nor of his family can cause the right thus established to vanish. *Salas* v. *Doe; Silva, Int.*, 75 P.R.R. 537 (1953).

The facts in this action present an example of the typical case of a wealthy boy, who in order to satisfy his first sexual urges roused in his early adolescence, takes refuge in a humble woman who serves him and who probably goes to him dazzled by the social position of her seducer and is even pleased for the "distinction" of which she is object. It is but the faint traces of the customs of a feudal society, transported to the present time. However, once the heat of the passion has dissipated and faced with the natural consequences of these relations, the social egoism uprises as a general rule and it is sought to wipe out and forget all that has happened. *Cf. Santiago* v. *Martínez*, 72 P.R.R. 873 (1951).

There is not the slightest doubt that during the first four years of her life—1928 to 1932—Mercedes Berdecía enjoyed

the possession of status of a natural child of Félix Rafael Saurí, evidenced by the acts which the respondent court has found proved and are by themselves sufficient, *cf. Jesús v. Heirs of Villamil*, 19 P.R.R. 850, 854 (1913), in which it was said that if a complainant can show clear acts extending over a period of six or seven years, he has made out a prima facie case; and by other acts that arise from the proof presented and which were not taken into consideration when applying strictly the rule of caution which we will discuss hereinafter. Saurí's withdrawal could have been due to the fact that when he returned to Puerto Rico in 1932, Dolores Berdecía, the plaintiff's mother, was already the mistress of Prudencio Ortiz. Three years later, in 1935 the plaintiff starts her ordeal to secure her acknowledgment, but Saurí remains silent to the allegations in the complaint filed and permits that his default be recorded. This passive attitude reveals that Saurí's moral principles and the dictates of his conscience did not let him oppose plaintiff's just claim.

From an examination of our case law and specially of the cases cited by the appellant, we can clearly see that in those cases in which the filiation action has been dismissed, the proof was not sufficient or was weaker—*Pabón v. Morales*, 79 P.R.R. 146 (1956) ; *Sánchez v. Díaz*, 78 P.R.R. 771 (1955) ; *Miranda v. Costa*, 77 P.R.R. 749 (1954) ; *Ortiz v. Dragoni*, 59 P.R.R. 14 (1941)—or were decided under the rule of strong and convincing proof—*Fontánez v. Heirs of Buxó*, 36 P.R.R. 202 (1927) ; *Serrano v. Olivero*, 31 P.R.R. 78 (1922) ; *Méndez v. Martínez*, 21 P.R.R. 238 (1914). In many cases the outcome would have been different if they had been decided subsequent to *Colón v. Heirs of Tristani*, *supra* and *Figueroa v. Díaz*, *supra*, as the proof introduced justified the granting of the filiation, as in *Delannoy v. Heirs of Cividanes*, 53 P.R.R. 108 (1938) ; *Torres v. Heirs of Caballero*, 39 P.R.R. 654 (1929) and *Charres v. Arroyo*, 16 P.R.R. 777 (1910). We would like to point out in passing

that the proof presented in *Vargas* v. *Jusino*, 71 P.R.R. 362 (1950) decided prior to the *Figueroa* case, would have been sufficient to warrant the possession of status, pursuant to the present position of our law.

We have compared the proof in the case at bar with that of other cases in which the recognition was granted and we believe that it successfully meets any test in respect to its sufficiency. *Salas* v. *Doe; Silva, Int.*, 75 P.R.R. 537 (1953) ; *Peña* v. *Heirs of Blondet*, 72 P.R.R. 8 (1951) ; *Maldonado* v. *Quetell*, 68 P.R.R. 390 (1948) ; *Bianchi* v. *Heirs of Bianchi*, 67 P.R.R. 557 (1947) ; *Cruz* v. *Carrasquillo*, 61 P.R.R. 422 (1943) ; *Vázquez* v. *Boyrié*, 52 P.R.R. 826 (1938) ; *Olivencia* v. *Parés*, 49 P.R.R. 889 (1936) ; *Guadalupe* v. *González*, 34 P.R.R. 643 (1925) ; *Vega* v. *Heirs of Vega*, 32 P.R.R. 548 (1923) ; *Cruz* v. *Quiñones*, 31 P.R.R. 323 (1923) ; *Jesús* v. *Heirs of Villamil*, 19 P.R.R. 850 (1913) ; *Desmornes* v. *Unknown Heirs of Desmornes*, 13 P.R.R. 18 (1907) ; and specially, *Mártir* v. *Hernández*, 73 P.R.R. 128 (1952), to which it is very similar.

On the other hand, we accept, for present purposes, that the proof of the acts of the father as to the possession of status should be carefully canvassed, whenever the action is brought after the death of the putative father. *Figueroa* v. *Díaz*, 75 P.R.R. 152 (1953). However, this does not mean that said proof should be rejected, if weighed as a whole and within the general picture of the evidence, especially if after a strict cross-examination, it remains uncontradicted in regards to its essential aspect and has only been controverted in points that somehow establish the frailty of the witnesses' memory as to unsubstantial details. This rule of caution may not be applied in the appreciation of the proof in this case, for although it is true that the putative father had died at the time the case was heard, it was established that during his lifetime the plaintiff went to court to claim her acknowledgment and he did not appear to make any pleadings in

regards to the complaint which, as we have previously stated, *set forth the same acts herein discussed*[10] *as the ground for her acknowledgment.* Moreover, as was said in *Morales* v. *Heirs of Cerame,* 30 P.R.R. 784 (1922), the case is different when it deals with a child who is very young at the death of his father. The trial court's expression that because the putative father was dead, it has only given credit "to that evidence of the plaintiff which we have believed because it appears to be supported by other facts which have not actually been in controversy," may not be interpreted in such a way as to bring about, in practice, the revival in the cases of filiation of the criticized rule of evidence of exclusion of testimony contained in the Act of March 10, 1904, commonly known as the "transaction with a decedent." *Colón* v. *Succession of Tristani,* 45 P.R.R. 219 (1933); *Góñez* v. *Palmieri,* 50 P.R.R. 439 (1936); *cf. Danz* v. *Suau, ante,* p. 591 (1961). Applying the very limitation under which the trial court made its decision, the proof established other facts which show the possession of status by the plaintiff which, although not necessary for the success of her litigation, corroborate the ultimate result reached. Thus, plaintiff's mother testified that Saurí used to say that the plaintiff was his daughter and would take her for a ride in his automobile (Tr. Ev., p. 31); that he bought a crib for the baby (Tr. Ev., p. 46) and certain furniture for the house on Miramar Street

---

[10] The present case is distinguished from *Torres* v. *Heirs of Caballero,* 39 P.R.R. 654 (1929), where it is stated that the proof should be studied cautiously when the filiation action is brought after the death of the father. There the rule was justified on the ground that in such situations, the person charged with the acts of acknowledgment cannot defend himself against them, and generally his relatives, *who very often are ignorant of the private life of the deceased,* have to disprove the imputations; and also because they waited until the death of the putative father to start the action, although a number of years since his birth had passed. The proof of the Heirs of Saurí tried to establish that this family was very close and that each member knew of the intimacies of the other. On the other hand, the present suit of filiation is only a continuation of the one started in 1935 when the putative father lived, and it can not be properly alleged that she waited until the putative father's death to file the action.

(Tr. Ev., p. 105) ; and that when she filed the first action for filiation in 1935, Rafael Saurí—father of the defendant Félix Saurí—took her to the office of a well-known lawyer in Ponce and there insisted that she withdraw the legal representation that she had given Mr. Erasto Arjona.[11] The witness Pedro Allende testified that when Saurí after returning from his school trips, visited the house of Dolores Berdecía, "he would take her [the plaintiff] and kiss her on the forehead . . . would dance with her and gaze at her" (Tr. Ev., pp. 484 and 607) ; he also stated that after the suit was filed in 1935, Saurí had told him that he would not answer the complaint "for she was his daughter" and that the girl would fetch money at Saurí's house (Tr. Ev., p. 492).

Now then this cautious attitude recommended in the weighing of evidence in cases where the filiation action is filed after the death of the putative father, is to our judgment, a corollary flowing from the restrictive interpretation of § 125 of the Civil Code which previously prevailed and from the rule which required strong and convincing proof. Said interpretation as well as the aforesaid rule have been abandoned in the course of years and there prevails at present a declaratory interpretation of statutes on filiation and, as to the degree of proof, only the preponderance of the evidence is required. On the other hand, we do not believe in applying to cases of filiation a rule different from that followed in other civil cases. It must be understood, therefore, that the statements made in some of our opinions about the caution

---

[11] It is significant that in the lengthy cross-examination of witness Dolores Berdecía she was not questioned on these points, and that, notwithstanding the steps taken to contradict plaintiff's proof in chronological details, the testimony of the attorney from Ponce, in whose office it is alleged said steps were taken by Saurí's father, was not presented. It also seems strange that when Mr. Arjona refused the representation in the suit for filiation—in dutiful discharge of his professional responsibility—he expressly made it clear, that "I do not agree with plaintiff in withdrawing the action or abandoning it" which is a written corroboration of this aspect of the testimony of plaintiff's mother.

that should be adopted when the putative father has died, do not represent a rule of evidence, which must be *invariably* applied by the judge. If the evidence presented in a filiation suit is believed by the court, taking into consideration all the elements which inform the judicial criterion, it should produce the corresponding legal effect, notwithstanding the fact that the suit was filed after the father's death, and despite the fact that the child had ample opportunity to claim his acknowledgment in court while the father was living.

It is true that the decisions of the Supreme Court of Spain interpreting § 135 of the Spanish Civil Code—similar in language to § 125 of our Civil Code—and invoked by appellant, have been governed by a stern, strict, and properly characterized, narrow view.[12] Hence, it has been held that the uninterrupted possession of status refers to constant and uninterrupted acts that reveal the firm and deliberate will of the father to hold, as his child, the pretender of such acknowledgment; that it may not be established by mere presumptions but only by direct proof; and that a set of notorious and repeated acts be required which, because of the nature of their circumstances, determine a situation of facts of a permanent character which ultimately establish the firm will of the father to acknowledge the child.[13] The strictness of this hermeneutic test has gone to the extent of denying the filiation on the basis of acts of the family of the putative father, because it is considered that acknowledgment is a very personal act, "an exclusive right of the father . . . and

---

[12] See, Antonio Martínez Radió: *Notas Acerca de la Filiación Ilegítima No Natural,* Revista de Derecho Privado, p. 363, Vol. XLI (1957); Manuel Albaladejo García: *El Reconocimiento de la Filiación Natural,* Barcelona (1954); Antonio Cicu: *La Filiación,* translations by Giménez Arnau y Santacruz, Madrid (1930).

[13] Judgments of the Supreme Court of Spain of October 28, 1954 (Revista de Derecho Privado, Vol. XXXIX, p. 799); April 26, 1951 (34 *Jur. Civ.* 926, II); February 2, 1948 (21 *Jur. Civ.* 311, III); June 25, 1946 (15 *Jur. Civ.* 354, III); December 27, 1944 (8 *Jur. Civ.* 866, II); May 1, 1945 (Revista Derecho Privado 187, Vol. XXIX); November 28, 1941 (*op. cit.* 61, Vol. XXVI); July 3, 1941 (Vol. XXV p. 582).

the failure to so exercise it cannot be supplied by any other person no matter how closely such person may be related to him." (Judgment No. 36 of February 2, 1948, 21 *Jur. Civ.* 311, III.) And moreover, the action has been dismissed when the predeceased father acknowledged the paternity before the birth of the posthumous child and the possession of status was established by the acts of the grandparents (Judgment of June 25, 1946, Revista de Derecho Privado, p. 875, Vol. XXX).

However, as one ponders carefully on this interpretative attitude it becomes clear that it responds to a series of factors peculiar to the Spanish medium and legislation such as the inspiration in a criterion opposed to the inquiry into paternity; the transcendence of the acknowledgment, in the family order, as well as in the social and economic order; the respect and protection due marriage and the legitimate family, and the influence of the canonical law which maintains that only the legitimate filiation is protected by the law. Yet, the path traced by our Legislature and our case law, departs from this restrictive interpretation, and applies other factors in its approach to the paterno-filial relations.

This notwithstanding, it must be admitted that the humanistic and sociological currents which inspired the advent of the Spanish Republic pointed out a different course, for ephemeral time, to the interpretation of the above-cited statutory provision, invoking the rule of a mere declaratory interpretation, instead of the restrictive rule which prevailed theretofore and which reappeared later when the constitution of 1931 was repealed.[14] In the Judgment of April 27, 1934 (213 *Jur. Civ.* 665) it is specifically held that after the effectiveness of Article 43 of the Constitution, which permits the investigation of the paternity—underlying rule of the

---

[14] As to the interpretation of the acknowledgment by means of a writing by the father in which he states his indubitable will of acknowledging the child, as his own, see Judgment No. 664 of December 8, 1933 (211 *Jur. Civ.* 399, I).

Puerto Rican case law—the previous doctrine which restrictively interprets the provisions of § 135 of the Civil Code is not applicable, and that the possession of status of a natural child implies a question of fact to be determined by the trial court.[15]   And in the Judgment of May 9, 1935 (219 *Jur. Civ.* 37) reference is made to the fact "that the new doctrine (of the Court), *in response to the state of the present collective conscience*" is not to interpret restrictively § 135 as was proclaimed by the traditional case law.   Commenting this last judgment in Revista de Derecho Privado, Vol. XXII, p. 158, it is said:

"Even without embracing all the conclusions promulgated by the supporters of the so-called *historicoevolutional* method of interpretation of the juridical norms, it may be accepted today, as well-settled doctrine and one of general acceptance, that in order to perform properly the function of interpretation, the *grammatical* and *logical* elements are not sufficient because if the law must keep contact with the exigencies of real life that constitute its reason of being, it is necessary that the results obtained on the basis of these two classical elements be buttressed and controlled by the application of the so-called *sociological* element, integrated by that series of elements—ideological, moral and economical—which reveal and satisfy the needs and the spirit of the community at each historical moment; and although it is true that these factors, besides not being able ever to authorize the interpreter to modify or not apply the norm but only to moderate it within the scope of the contents of the text which is in issue, require in their use much caution and prudence, because there is a great risk of arbitrariness involved in submitting to the subjective opinion of the judge such delicate appreciations as the moral conscience of a people, it must be recognized that its application is more certain and controlling when it deals, not with the state of conscience still nebulous or in process of formation, but with tendencies or ideas that

---

[15] To prove the possession of status the acts of the mother and of the defendant's brothers and sisters, "constant show of affection and care revealed in such eloquent acts as teaching her how to pray," were deemed sufficient.

have penetrated already into the system of the positive legislation or have obtained their recognition in an unequivocal manner in the supreme law of the State."

There is not the least doubt that these last judgments adequately show the present position of this Court in matters of filiation. Locally, the rule of restrictive interpretation is not justified since the investigation of the paternity has been constantly permitted, *Colón* v. *Heirs of Tristani*, 44 P.R.R. 163, 169 (1932) and besides, our positive law is deeply concerned with the subjective right of the individual, that is, the right of the innocent child who ignores the conditions under which he was begotten, and upon whom the penalties of guilt are inflicted without his intervention. See Acts No. 229 of May 12, 1942 (Sess. Laws, p. 1296) (31 L.P.R.A. § 502); No. 243 of May 12, 1945 (Sess. Laws, p. 814); and Act No. 17 of August 20, 1952 (Sp. Sess. Laws, p. 200) which states in unequivocal terms the dogma of equality of children before the law when it states that "All children have with respect to their parents and to the estate left by the latter the same rights which correspond to legitimate children."

For the reasons stated, and none of the errors having been committed, the judgment appealed from rendered by the Superior Court, Ponce Part, on March 10, 1959, will be affirmed.

Mr. Justice Hernández Matos did not participate herein.

Mr. Justice Pérez Pimentel concurs in the result.

———

Mr. Justice Santana Becerra, concurring.

In the cases of filiation decided since I became part of this Court, some of them without an opinion, I have been taking note or reserving my view as to which should be the filial pronouncements after the Constitution of 1952. In the light of the proof in the record the declaration of filiation which we today affirm is fully justified, even under the exigencies of the requirements of proof that the trial court as well as this Court has taken into consideration. But in-

sofar as my way of thinking is concerned, the outcome of the case would be the same if the filiation were decreed even without proof in regards to the possession of status of natural daughter. Consistent with my previous position, I point out my view in this occasion, briefly, since the elements of time and the dispatch of work do not allow, for the time being, an elaborate exposition of the concepts which I state.

The plaintiff was born on October 3, 1928, as a result of the relations between her mother and Félix Rafael Saurí. Thus it was found by the trial court as a question of fact, and as a conclusion of law it stated: "The fact of paternity of Félix Rafael having been established, the other facts which we found proved are *coupled thereto* in order to establish in turn the acknowledgment of the plaintiff on the ground of the uninterrupted possession of status as his natural child." The judgment declared the plaintiff "recognized natural daughter" of Félix Rafael Saurí. The complaint was filed on August 18, 1952 and said pronouncements were made on March 10, 1959, both things subsequent to July 25, 1952. (Emphasis added.)

The Bill of Rights of the Commonwealth of Puerto Rico provides that the dignity of the human being is inviolable; all men are equal before the law and *no discrimination shall be made* on account of race, color or sex, *birth*, social origin or condition or political or religious ideas.* After having explained this constitutional provision in its full contents and scope, the Report of the Committee on the Bill of Rights in the Constitutional Convention says:

"The purpose of this section is to clearly settle as a consubstantial basis of everything that underlies the principle of the dignity of the human being, and as a consequence thereof, the essential equality of every person within our constitutional system. Equality before the law is above all the *accidents* or differences, whether they originate in *nature* or *culture*. Any

---

* Constitution, Article II, § 1.

discrimination or privilege contrary to this essential equality is repugnant to the juridical system of Puerto Rico. Insofar as it may be necessary, our legal organization is *buttressed* by the present constitutional provision and at the same time is *bound to enhance* its provisions in order to *enforce with full force* the provisions contained herein." (Emphasis added.)

Referring more particularly to the discrimination on account of birth, the Committee stated:

"It is intended *to eliminate* the juridical stigma against the children born out of wedlock. All children are deemed with respect to their parents and with respect to the *juridical order* to have equal rights. Illicit relations may and should be prohibited and one of the consequences of this provision shall be to discourage them. But the innocent fruit born from such relations, must come into the world free of any disqualifications or juridical inferiorities. Such is the principle of the individual responsibility by which we must abide pursuant to which no one is guilty of the acts he has not committed himself. Although the present legislation already covers almost in its entirety the provisions contained herein, new legislation is required. For the purposes of *inheritances and properties,* any modification worked into this section shall not be retroactive to births before the effective date thereof." (Emphasis added.)

No discrimination may be established on account of birth, says the Constitution, fixing ["as a consubstantial basis of everything that underlies the principle of the dignity of the human being"] the essential equality of all the persons within the constitutional system. To me it signifies and means that after said order the courts shall make no pronouncement whatever cataloguing, distinguishing, modifying or qualifying the child's condition, once the fact of paternity has been adjudicated. I understand that said order must be complied with in every action for filiation not already decided when the Constitution went into effect, regardless of its commencement or of the date of birth, or of the statutory provisions existing at the time the child was born.

In the terms of the essential equality of all persons as proclaimed by our Constitution, I do not conceive a state of law that may apply said constitutional declaration, with respect to the birth, to those who were born after its proclamation, implying a reservation with respect to its effectiveness which is not mentioned in its text nor contemplated in its spirit, and which would allow various generations to continue in the system of disequality and of the indignity of the human being for lack of the essential equality, until said generations be extinguished by the natural process of their disappearance. It is in this significant sense that the Committee on the Bill of Rights made these statements. "It is intended *to eliminate*," it says, the juridical stigma against the children born out of wedlock. "*All* children are deemed," it continues, with respect to their parents and *with respect to the juridical order*, to have equal rights.

In the spirit of human revendication through the essential equality of the person in which that part of our Bill of Rights was adopted, I do not conceive a state of law which might affect the generation already begotten, and which even under an advanced legislation concerning children from 1942 to 1952, as it has been interpreted, still maintains that which is still to me a specious situation in the juridico-social aspect where the begetting father and the begotten child are deemed as such for one purpose but not for another, as if nature could play a dual role. Nor can I conceive within the spirit pointed out, that it was ever contemplated to leave the begotten offspring subject to the contingent peril of a regression in the advanced legislation prevailing at the time of the proclamation of the Constitution, which under the state of law that I point out, would be plausible if it were not extended to those born subsequently.

I have referred to the essential equality of a child in the person, not in his patrimony. The difference in the patrimony, "inheritance and properties" does not create stigma.

Within the marriage system itself some children have received less patrimony than others, without being deemed, on that account, as not having the essential equality in person. And even with respect to patrimony, after the Constitution, *all children*, no matter when or the condition in which they were born or whether they have been declared such children, are to participate in the inheritance with the same rights.**

I am convinced that by operation of the constitutional declaration, as I see fit to construe it, § 125 of the Civil Code has no reason of being. Having been declared as its father's child, it must be deemed as having the essential equality of person by reason of the superior constitutional declaration. The acts prescribed by § 125—particularly those which the father himself or his family must perform and from which the possession of status arises—which would bring the child into the family as a member thereof and give him a father before the law and society, or which would frustrate him if unable to prove them, are to me, accidents as the Committee on the Bill of Rights stated in its Report, over which the equality before the law must prevail. I consider § 125 much like an anachronism which should pass instantly to take its proper place in a family right which has become historic.

For the foregoing reasons I would also affirm the judgment irrespective of whether there was sufficient proof about the possession of status of natural child; and it having been alleged and proved, according to the record that at the time of the conception the parents could marry, and that the father died, I would modify it to the effect of declaring Mercedes Berdecía as the daughter of Félix Rafael Saurí, with the right to inherit him or represent him as provided for the acknowledged natural children by the law in force at the time of the father's death.

---

** See Act No. 17, August 20, 1952.